TAMI TAROCHIONE,            )
                                 )
          Plaintiff,         )
                                 )
          v.               )     No. 16 C 6770
                                 )
LABORERS' LOCAL 75, and LABORERS'   )     Judge Rebecca R. Pallmeyer
INTERNATIONAL UNION OF NORTH     )
AMERICA,                      )
                                 )
          Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Tami Tarochione alleges that the labor organization of which she was a member, Laborers' Local 75 ("Local 75"), discriminated against her on the basis of sex and in retaliation for her engaging in protected conduct. Tarochione asserts that Local 75, which runs a non-exclusive referral hall for its members, refused to refer her to jobs with outside contractors because she is a woman, and in retaliation for her filing of a previous lawsuit, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000. Local 75 now moves for summary judgment on both counts. For the reasons explained here, the motion is granted.

## STATEMENT OF FACTS

In setting out the undisputed facts of this case, the court relies principally on the Local Rule 56.1(a) statement submitted by the Defendant and the Local Rule 56.1(b)(3)(B) response submitted by the Plaintiff. Plaintiff's Local Rule 56.1(B)(3)(C) statement of additional facts, unfortunately, largely fails to meet the requirements of Local Rule 56.1. Specifically, that rule requires the non-moving party to submit a statement of additional facts comprised of "short numbered paragraphs" that set forth "additional facts that require the denial of summary judgment" (i.e., facts relevant to the plaintiff's claims) and include "references to affidavits, parts of the record, and other supporting materials relied upon." N. D. ILL. LOCAL RULE 56.1(b)(3)(C). Many of the statements within Plaintiff's submission in this case are speculative or conclusory,

while others are never discussed in Plaintiff's memorandum of law; still others relate only to a hostile work environment claim that has already been dismissed. Also disappointing, few of the events discussed are assigned even approximate dates or coherently organized relative to one another. Plaintiff's citations to the record are troublesome, as well; they often direct the court to pages that do not appear in the record, or to exhibits that do not support Plaintiff's contentions.[1] The confusion created by these problems is confounded by Plaintiff's failure to reduce her allegations to short, numbered paragraphs, as Local Rule 56.1 expressly requires.

The court is entitled to expect strict compliance with Local Rule 56.1. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011). Plaintiff's statement of additional facts falls short well short of this expectation. Where properly articulated and adequately supported by the record, the court has nevertheless taken Plaintiffs' additional facts into account. The remainder is stricken for purposes of this motion.

## I. Local 75 and Its Referral System

Defendant Local 75 is a labor organization that serves as the exclusive bargaining agent for laborers performing construction work in Will and Grundy Counties, Illinois. (Def.'s 56.1 [102] ¶¶ 1-2.) Local 75 is affiliated with the Laborers' International Union of North America ("LIUNA"), and the two entities are party to a National Pipeline Agreement negotiated by LIUNA. (*Id.* ¶¶ 1, 9 n.1, 49.) Jobs secured by Local 75's members are often seasonal and temporary. (*Id.* ¶ 6.) Local 75 operates a non-exclusive "referral hall" through which contractors may request referrals of workers from among Local 75's members. (*Id.* ¶ 9.) To facilitate referrals, Local 75 creates and maintains an out-of-work list (the "OWL")—that is, a list of members who have registered their

---

[1] Plaintiff does not bear sole fault for the confusion. Both parties chose to file exhibits by number, such that there are two each of Exhibits 1 through 26. Yet Plaintiff at times refers to exhibits solely by their number, leaving it to the court to ferret out which document Plaintiff meant to cite. (*See, e.g.*, Pl.'s 56.1 ¶¶ 6, 23.) Defendant chose to file excerpts of several depositions, which Plaintiff then re-filed in complete form. The deposition of William Martin was then broken into two parts. As a consequence, there are three different documents to which the parties could be referring when citing to "Martin Dep. at ___." (*See, e.g.*, Pl.'s 56.1 ¶ 7.)

availability for work. (*Id.* ¶ 12.) When registering for the OWL, members provide details regarding their skills, work experience, and certifications, all maintained in the OWL. (*Id.* ¶ 13.) (*Id.*) To remain on the OWL, members must continue paying membership dues. (*Id.* ¶¶ 23-24.)

Under its referral rules, Local 75 generally refers members out in the order in which they registered for the OWL, "provided that the applicant has the qualifications requested by the employer." (Referral Rules at 2, Ex. 5 to Def.'s 56.1.) When a contractor requests workers who possess certain skills or qualifications, Local 75 utilizes a "filtered OWL," which omits laborers who have not notified Local 75 that they possess the skills or qualifications relevant to the request. (Def.'s 56.1 ¶ 18.) Some contractors also request referrals of particular members by name. (*Id.* ¶ 15.) Such a name-specific request "shall be fulfilled" when the requested member has worked for the requesting contractor in the preceding six months. (Referral Rules at 2.) The rules prohibit discrimination on the basis of gender. (Pl.'s 56.1 [115] ¶ 3.)

When a member accepts a referral to a new job, she becomes unavailable for other referrals that would start before the accepted job's start date. (Def.'s 56.1 ¶ 22.) If the job lasts longer than ten working days, the member is required immediately to advise Local 75, which then removes her name from the OWL. (*Id.* ¶ 19.) Upon completion of the job, the member must re-register for the OWL in order to be considered for another referral. (*Id.*) A member who receives a job referral that lasts fewer than ten working days, however, maintains her position in the OWL until she accepts a second referral of any duration. (*Id.* ¶ 21.)

Contractors who take part in the referral system maintain discretion to refuse to employ any particularly laborer referred to them. (Def.'s 56.1 ¶ 10.) And a contractor's superintendents and foremen have the right to lay off or fire workers without supervision or input from Local 75. (*Id.* ¶¶ 30-32.) Contractors are also permitted to bypass Local 75's referral system altogether by recruiting and hiring workers directly. (*Id.* ¶ 12.) The majority of contractors who perform work in Local 75's territorial jurisdiction do not take part in the referral system at all. (*Id.* ¶ 18.) In practice, it is possible for a member to remain on the OWL for months without receiving a referral; some

members never receive a referral, and instead solicit work directly from contractors.  (*Id.* ¶¶ 26-29.)

Two Local 75 officers, William Dietz and William Martin, play a role in Tarochione's claims. From 2002 through 2018, Dietz was Local 75's Secretary Treasurer.  (Dietz Dep. at 7, Ex. 2 to Def.'s 56.1; Martin Decl. at ¶ 3, Ex. 17 to Def.'s 56.1.)  Dietz's responsibilities included overseeing the referral list and ensuring the referral rules were followed.  (Dietz Dep. at 16, Ex. 6 to Pl.'s 56.1.)  From 2009 through April 2015, Martin was Local 75's Vice President.  (Martin Decl. ¶ 2, Ex. 17 to Def.'s 56.1.)  Martin then served as Local 75's President from April 2015 until January 2018.  (*Id.*)  Since then, Martin has been Local 75's Business Manager.  (*Id.*)  Martin was one of several Local 75 officers who referred members to contractors.  (Pl.'s 56.1 ¶ 4.)

## II. Tarochione

### A. Background

Plaintiff Tami Tarochione, born June 7, 1959, has worked as a journeyman laborer since 1996.  (Def.'s 56.1 ¶ 33); (Pl.'s 56.1 ¶ 1.)  Between 1996 and 2006, Tarochione was unaffiliated with Local 75, and worked at various nuclear power plants.  (*Id.* ¶¶ 37-38.)  In 2006, Tarochione filed a Title VII discrimination lawsuit against several of those plants.  (*Id.* ¶ 39.)  That lawsuit ended in settlement in February 2009 (the "2009 Settlement").  (*Id.*)  Under the terms of the settlement, Tarochione agreed to never again seek employment from, or work at, any of the nuclear power plants at which she had previously worked.  (*Id.*)

Tarochione joined Local 75 in 2006.  (Def.'s 56.1 ¶ 33.)  Thereafter, Tarochione testified, she kept and maintained calendars in which she contemporaneously documented events related to "work and work related issues."  (Pl.'s 56.1 ¶ 2.)  These calendars are in the record, and Tarochione relies on them for many of her factual allegations.  (*Id.*)

## B. Protected Activity

### 1. 2011 Worker's Compensation Claim

In 2007, Tarochione performed work for D Construction.[2] (Pl.'s Ans. Def.'s Inter. at 4, Ex. 12 to Def.'s 56.1.) In 2011, Tarochione filed a workers' compensation claim against D Construction, which was denied.[3] (Def.'s 56.1 ¶¶ 43-44.) Tarochione testified that she believes this claim prompted Local 75 to retaliate against her. (Def.'s 56.1 ¶¶ 43-44.) In her response to this motion for summary judgment, however, Tarochione disavows any claims based on the 2011 workers' compensation claim. (Pl.'s Resp. Def.'s MSJ [113] at 13 n.8.)

### 2. 2013 Lawsuit and Settlement

In August 2012, Local 75 referred Tarochione to a pipeline contractor called Roberts Pipeline. (*Id.* ¶ 46.) Tarochione began working at Roberts Pipeline on August 8, 2012. (*Id.*) On August 20, 2012, Roberts Pipeline laid off Tarochione. (*Id.* ¶ 47.) Tarochione contacted William Martin the next day, on August 21, 2012, to inform him that she "couldn't understand why she was laid off." (*Id.*) Tarochione characterizes this conversation as the filing of an "oral grievance," and avers that she informed Martin, "that I was fired for a made-up, false reason and that I was replaced with a male worker. I complained that I was terminated because I was female." (Dec. 1 Tarochione Decl. ¶¶ 2-5.) Martin followed up with Roberts Pipeline, who responded that Tarochione was not "cutting it." (Def.'s 56.1 ¶ 48, citing Martin Dep. [102-2] at 142.) Martin recalled that he expressed skepticism (he recalls asking "Why all of a sudden isn't she cutting it? Took you nine days to realize that?") and warned that Local 75 would file a grievance on Tarochione's behalf. Under the National Pipeline Agreement, however, Local 75 did not have authority to file a grievance against Roberts Pipeline. (*Id.* ¶ 49.) LIUNA did have the authority, but when Martin recommended that LIUNA file a grievance, LIUNA declined, finding that a

---

[2]     The record does not state whether Tarochione was referred to D Construction by Local 75.

[3]     Tarochione testified that she was "hit by the car." (Def.'s 56.1 ¶ 44.)

grievance was "not warranted" and citing the "management rights" doctrine.  (*Id.*; Martin Dep. at 142.)

On February 19, 2013, Tarochione filed a lawsuit against both Local 75 and Roberts Pipeline.  (*Id.* ¶ 50.)  She later amended her complaint to add LIUNA as an additional defendant (the "2013 Complaint").  (2013 Complaint, Ex. 26 to Def.'s 56.1.)  The lawsuit charged that Local 75 and LIUNA had breached their duty of fair representation to Tarochione under the Labor Management Relations Act by "fail[ing] to adequately represent [her] in her grievance proceedings, and refus[ing] and/or fail[ing] to process [her] legitimate grievance beyond a mere perfunctory nature."  (*Id.* at 6.).  It additionally brought a Title VII claim against Roberts Pipeline for gender discrimination and an ADA claim against Roberts Pipeline for disability discrimination related to shoulder surgery she had allegedly undergone prior to the start of her work.  (*Id.* at 7-10.)

Tarochione settled her claims against Local 75 and LIUNA on September 10, 2013 (the "2013 Settlement").  (Def.'s 56.1 ¶ 51.)  As part of the settlement, Tarochione agreed to waive and release Local 75 from "all claims, rights, demands, costs, actions, causes of action, obligations, damages, and liabilities, whether known or unknown, of whatever kind or nature, that arose on or before [September 10, 2013], including but not limited to [claims under Title VII]."  (Settlement Agreement at ¶ 3(a)(iii), Ex. 27 to Def.'s 56.1.)

Of the compensation remitted to Tarochione under the 2013 Settlement, half was paid by Local 75 and the other half by LIUNA.  (Martin Dep. at 56-57, Ex. 9 to Def.'s 56.1.)  Martin disagreed with the decision to settle, and Local 75's agreement to cover half of the cost, because he believed Local 75 "did their part . . . contractually and represented [her]."  (*Id.*)  Though the record does not identify Local 75's president at this time, who presumably approved the payment, it is clear that Dietz also disagreed.  He too believed that Local 75 "handled everything that they could to their furthest ability," and that LIUNA bore full responsibility.  (Dietz Dep. at 11-13, Ex. 6

to Def.'s 56.1.)  Subsequently, Tarochione settled her claims against Roberts Pipeline as well. (Def.'s 56.1 ¶ 53.)

### C.    Alleged Retaliation and Discrimination

#### 1.    2013

Local 75 has presented evidence of Tarochione's earnings.  The record shows that in 2013, Tarochione worked 838.5 hours in total, earning $40,066 in wages.  (Def.'s 56.1 ¶ 55.)  This amounted to more hours and greater wages than Tarochione had earned in any of the prior five years.[4]

##### a.    BMW Construction

In May 2013, Local 75 referred Tarochione to a job site managed by BMW Construction ("BMW").  (Def.'s 56.1 ¶ 64.)  Tarochione was laid off from the BMW job (the court is uncertain of when) "due to [a] reduction in force" by a man named "Curly Vaughn."  (*Id.* ¶ 68; Pl.'s Resp. to Roberts' Interrogatories ¶ 3(c)a., Ex. 12 to Def.'s 56.1.)  Tarochione has presented conflicting information concerning Vaughn's position and affiliation.  In describing her work for BMW in response to an interrogatory, Tarochione wrote "Foreman's name: Curly Vaughn," suggesting Vaughn was BMW's foreman.  (Pl.'s Ans. to Inter. ¶ 3(a).)  But when asked in her deposition whether BMW laid her off, Tarochione replied, "No. My steward," and elaborated that she believes Curly Vaughn to have been the appointed steward of Local 75.  (Tarochione Dep. at 96.)  As reflected in discovery responses in the lawsuit against Roberts, it is undisputed that Plaintiff was laid off "due to [a] reduction in force."   (Pl.'s Resp. Roberts' Interrogatories ¶3(c)a, Ex. 12 to Def.'s 56.1.)

---

[4]      In 2008, 2009, 2010, 2011, and 2012, Tarochione worked 237.5 hours, 667.5 hours, 126 hours, 0 hours, and 156 hours, respectively.  (Def.'s 56.1 ¶ 42.)  The only year prior to 2013 in which Tarochione's earnings are in the record is 2012; Tarochione earned $6,764 that year.  (*Id.*)

### b.     Henkels & McCoy

On August 28, 2013,[5] Martin referred various Local 75 members to a job managed by Henkels & McCoy.[6]  (Def.'s 56.1 ¶ 76.)  Tarochione was not among those referred.  Henkels & McCoy also hired at least seven laborers directly, without going through Local 75's referral hall. (Def's Resp. Pl.'s 56.1 [122] ¶ 22.)

The parties dispute whether, under Local 75's referral rules, Tarochione was eligible to be referred on August 28, 2013.  Under those rule, an individual who accepts a referral is ineligible to receive other referrals for jobs that would start prior to her scheduled start date.  (Def.'s 56.1 ¶ 22.)  Local 75 contends that, two days before the Henkels & McCoy referrals were made, Tarochione accepted a referral to a different job at the Braidwood nuclear power plant with a start-date of September 3, 2013.  (Id. ¶ 77.)  William Dietz recalls that he contacted Tarochione about the Braidwood job on August 26, 2013 and that, during this conversation, Tarochione accepted the referral.[7]  (Dietz Decl. at ¶ 28, Ex. 1 to Def.'s 56.1.)  Dietz further contends that either he or Geralyn Duff called Tarochione again on August 28 to inform Tarochione that she was expected to report to the power plant on September 3, 2013.  (Id. ¶ 29.)  Tarochione acknowledges that she accepted a referral to the nuclear power plant, but denies that she was called prior to August 28, 2013.  (Pl.'s Resp. Def.'s 56.1 ¶ 77.)  Her calendar includes a notation that she received a call

---

[5]     Tarochione disputes this date, contending that the referrals were made on or before August 27, 2013.  (Pl.'s Resp. to Def.'s 56.1 ¶ 76.)  The only evidence she cites for this contention purports to be a "Pre-Job Conference Report" for a Henkels & McCoy job.  (Id.)  On its face, the exhibit refers to a job that began July 7, 2016.  (Pre-Job Report, Ex. 7 to Pl.'s 56.1 [115].)  There is no evidence or testimony tying this document to the 2013 job that is relevant to Tarochione's claims.

[6]     Tarochione has identified five Local 75 members whom she claims were referred to the Henkels & McCoy job through the referral hall, despite being lower than Tarochione on the OWL list.  (Pl.'s 56.1 ¶ 23.)  The material she cites, however, shows only that these individuals worked at Henkels & McCoy during the relevant period--not that they were referred.  (See Local 75's Ans.'s Pl.'s 2nd Interr.'s, Ex. 12 to Pl.'s 56.1.)

[7]     Tarochione never actually worked the Braidwood job, as she was denied entrance to the Braidwood plant as a consequence of the 2009 Settlement.  (Def.'s 56.1 ¶ 78.)

regarding the referral on August 28, 2013, whereas the calendar entry for August 26 is blank. (*Id.*)  Local 75's phone records do show calls placed to Tarochione on August 26 and 28, 2013. (Phone Records, Ex. 1A to Def.'s 56.1.)

The following week, on September 7, 2013, Tarochione testified she visited the Henkels & McCoy jobsite and asked the superintendent for a job.  (Def.'s 56.1 ¶ 71.)  Tarochione believes the superintendent's name was "Jeff."  (Tarochione Dep. at 101, Ex. 1 to Pl.'s 56.1.)  The superintendent responded that Tarochione should speak to "the Local 75 union steward" about getting hired.  (Def.'s 56.1 ¶ 71.)  Subsequently, Tarochione recalls, she spoke to Terry Speed, who the parties have identified as the general foreman of Nooter Construction, another contractor. (*Id.* ¶ 72, 107.)  It is undisputed that Speed has never worked for Henkels & McCoy or served as the union steward at the Henkels & McCoy jobsite.  (*Id.* ¶ 73.)  According to Tarochione, Speed told her that he would "get back to her about the job," but never did so.  (*Id.* ¶ 72.)

### c.    Turner Industrial Maintenance LLC

On September 5, 2013, Dietz called and referred Tarochione to a "flagger" job with P.T. Ferro.  (*Id.* ¶ 79.)  Plaintiff characterizes flagger jobs as undesirable because, she testified, they seldom offer full-time hours.[8]  (Pl.'s 56.1 ¶ 5.)  Nevertheless, Tarochione accepted the referral and worked for P.T. Ferro from September 6 to October 25, 2013.  (Def.'s 56.1 ¶ 79.)

Tarochione believes that while she was working the P.T. Ferro job in September and October, she was entitled to be referred to a job with Turner Industrial Maintenance LLC ("Turner") at the Citgo refinery.[9]  (Def's 56.1 ¶ 82.)  As Tarochione was actively working during this period, however, it is undisputed that she was not eligible for a referral elsewhere.  (Def.'s 56.1 ¶ 85.)

---

[8]    Local 75 disputes this characterization.  Other laborers who worked flagger jobs for P.T. Ferro in 2013 averaged 176 hours of work in September and 191 hours in October.  (Def.'s 56.1 ¶ 81.)

[9]    To the court's knowledge, neither party offers evidence, or even expressly alleges that Turner was operating a jobsite during this period, nor that other Local 75 members were referred to a Turner job prior to November 1, 2013.

On October 25, 2013, Tarochione's job at P.T. Ferro ended. (Def.'s 56.1 ¶ 86.) Three days later, on October 28, Tarochione re-registered for the OWL. (*Id.*) Between October 28 and November 1, 2013, Turner did not request any referrals.[10] (*Id.* ¶ 86.) On November 1, Dietz referred Tarochione to a Turner job.[11] (*Id.* ¶ 86.) Tarochione worked for Turner for one day— November 4, 2013—before she was laid off. (Pl.'s 56.1 ¶ 37.) Plaintiff testified that she then sought assistance from Bill Callahan, a superintendent for Sanchez Paving Company ("Sanchez"), which was also operating a job at the Citgo refinery. (Tarochione Dep. at 328, Ex. 1 to Pl.'s 56.1.) Tarochione worked for Sanchez at the Citgo refinery from November 2013 to February 2014, at which point she was laid off. (Def.'s 56.1 ¶ 91.)

### 2. 2014

Tarochione testified that 2014 was her "best year as a laborer" in earnings. (*Id.* ¶ 88.) She worked 1,419.5 hours and earned $79,612. (Def.'s 56.1 ¶ 55.) Neither party has offered evidence concerning the earnings of similarly-situated Local 75 members during this period. In April 2014, P.T. Ferro's superintendent contacted Tarochione directly to offer her a series of part-time job assignments. (*Id.* ¶ 92.) Tarochione accepted, and worked at P.T. Ferro from April to August 2014. Local 75 subsequently referred Tarochione to Turner, where she worked from September 25 to October 28, 2014. (*Id.* ¶ 93.) Tarochione did not work again for the rest of the year. (*Id.* ¶ 94.) In November, Local 75 referred more than 150 members to work at a nuclear power plant. (*Id.* ¶ 95.) Tarochione was not eligible for these referrals under the terms of the 2009 Settlement. (*Id.*)

---

[10] Tarochione disputes Dietz's recollection that Turner was not requesting referrals during this period, but cites nothing in support of her disagreement. (Pl.'s Resp. Def.'s 56.1 ¶ 86.)

[11] The court presumes that this is the same job that Tarochione believes she should have been referred to in September or October. As discussed in note 10, *supra*, however, Tarochione fails to develop this allegation with record evidence.

### 3. 2015

In 2015, Tarochione worked 818 hours and earned $42,500. (Def.'s 56.1 ¶ 55.) Again, neither side has provided information concerning how this income compared with that of other Local 75 members having similar seniority and qualifications to Tarochione. This amounted to fewer hours than Tarochione worked in either 2013 or 2014, although she recovered greater compensation in 2015 than in any year on record other than 2014. (*Id.*) These hours were derived solely from jobs to which Tarochione was referred through Local 75's referral hall. (*Id.* ¶ 57.) On April 24, 2015, Local 75 referred Tarochione to Turner. (*Id.* ¶ 99.) Tarochione worked for Turner from May 4 to July 22, 2015. (*Id.*) In August 2015, Local 75 referred Tarochione to a flagging job with Beniach Construction. (*Id.* ¶ 100.) The Beniach job lasted four days. (Tarochione Dep. at 162, Ex. 1 to Pl.'s 56.1.)

Tarochione declined job referrals on September 2, September 9, and September 30, 2015.[12] (Def.'s 56.1 ¶ 101.) Plaintiff's calendar notes state that these jobs would each have lasted between one and two days. (Pl.'s 56.1 ¶ 6.) Tarochione's stated reason for declining the first two jobs was that she had undergone minor surgery. (Def.'s 56.1 ¶ 101.) There is no reason provided for Tarochione declining the September 30 job, other than that she believed it to be undesirable. (Pl.'s Resp. Def.'s 56.1 ¶ 101.)

Plaintiff challenges the circumstances regarding 2015 referrals to two contractors: Nooter Construction and Challenger Drilling, discussed in more detail below. .

#### a. Nooter Construction

On September 10, 2015, William Martin referred six Local 75 members to a job with Nooter Construction ("Nooter"). (Def.'s 56.1 ¶ 105.) These members were Jerry Sereno, Anthony Hairald, Angela Ott, Richard Howard, Dennis Day, and John Radakovich. (*Id.*) A copy of the

---

[12] Tarochione contends that "many people had to have been skipped on the OWL for [Tarochione] to have been referred to [these jobs]," but cites nothing that supports this contention. (Pl.'s 56.1 ¶ 6.)

OWL from September 11, 2015 reflects that only four of these laborers—Sereno, Hairald, Ott, and Howard—had priority over Tarochione on the OWL. (*Id.*) Day was below Tarochione and Radakovich was not on the OWL at all. (*Id.*) In selecting Day, Martin passed over Tarochione as well as 60 men and 17 other women. (*Id.* ¶ 106.) In selecting Radakovich, Martin passed over Tarochione as well as 107 men and 26 other women. (*Id.*)

Martin testified that he selected Day and Radakovich because Nooter's general foreman, Terry Speed, suggested that Martin refer laborers who were close to retirement. (Def.'s 56.1 ¶ 107.) Although he does not specifically recall making this suggestion in this instance, Speed testified that making such a suggestion is a common practice of his. (*Id.* ¶ 108.) According to Martin, Day and Radakovich had both notified him that they were looking to retire. (*Id.* ¶ 109.) Radakovich did in fact retire on November 2, 2015, and Day retired on June 1, 2015. (*Id.* ¶ 111.) Tarochione would later retire on January 1, 2018. (*Id.* ¶ 112.)

Plaintiff has identified further testimony that she contends is relevant to her claims as they relate to the Nooter referrals. (*See* Pl.'s 56.1 ¶¶ 9-20.) She summarizes testimony from and about four individuals: (1) Terry Speed, Nooter's general foreman; (2) Rich Jurzack, Local 75's appointed steward for the Nooter job;[13] (3) Don Doran, a pipefitter and acquaintance of Tarochione's; and (4) William Martin, Local 75's then-president. Many of her statements about this testimony are vague or unsupported by the record, and the court struggles to find a link between much of the cited testimony and Tarochione's conclusions and claims.[14] Several of the

---

[13]    The parties have not specified when Jurzack was hired, although Plaintiff has cited testimony from Jurzack that he, Day, Hairald, Howard, Ott, and Radakovich obtained the job at Nooter through the referral hall. (Pl.'s 56.1 ¶ 18.)

[14]    For example, Plaintiff asserts that "Doran, Speed, and Rich Jurzak testified that Martin and Jurzak met in the parking lot of the Exxon Mobil refinery on or about September 9, 2015 to discuss additional staffing for the Nooter job." (*Id.* ¶ 15.) She also asserts that "Martin indicated he spoke with Doran regarding Mr. Doran's interest in having [sic] employed with Nooter." (*Id.* ¶ 17.) The significance of these alleged conversations, and how they support Plaintiff's claims, is lost on the court, and Plaintiff's briefs are not enlightening.

allegations, moreover, plainly do not comport with Local Rule 56.1's requirement of short, numbered paragraphs. (*See id.* ¶¶ 13, 19.) As Tarochione has not distilled these allegations into discrete, relevant factual allegations with support in the record, they are disregarded for purposes of this motion.

### b.    Challenger Drilling

In December 2015, William Martin referred Local 75 members to a directional drilling job run by Challenger Drilling Inc. ("Challenger"). (Def.'s 56.1 ¶¶ 117-18.) For the first set of referrals, Martin utilized a filtered OWL restricted to laborers with directional drilling experience, because Challenger had requested laborers with such experience. (*Id.* ¶ 118; Martin Dep. 152-53, Ex. 9 to Pl.'s 56.1.) Relying on the filtered OWL, Martin referred Neal Smolik,[15] William Thiakos, Tony Alberico, and Dan Baudino to Challenger. (*Id.* ¶¶ 116, 118.) Tarochione was not included in this list because she had not reported having directional drilling experience. (*Id.* ¶ 118.) Thereafter, on December 19, Martin switched to a general OWL, and using that list, referred Tarochione and a male laborer, Mike Votta, to Challenger. (*Id.* ¶ 120.) Challenger assigned both Tarochione and Votta to a night shift, working the same work schedule and hours. (*Id.* ¶ 121.) They began work on December 21, 2015. (Smolik Aff. ¶ 6, Ex. 20 to Def.'s 56.1.) During Tarochione's tenure, she observed Thiakos performing work that she contends was "the same (on the day shift) that [she] did on the night shift, which was primarily to shovel mud." (Tarochione Decl. ¶ 6, Ex. 2 to Pl.'s 56.1.) She believes this this undermines Local 75's allegation that Challenger initially requested workers with directional drilling experience. *See* Discussion, *infra*, at Section II.B.

On January 9, 2016 Tarochione and Votta were laid off. (Smolik Aff. ¶ 7.) The parties dispute whether Local 75 was responsible for this decision. Neal Smolik, Local 75's appointed steward for the job, wrote in an affidavit that as of January 9 "the work being performed by the night shift crew was completed and so [Challenger's foreman, Keith Sanders] told me to layoff

---

[15]     Smolik was also appointed Local 75's steward for the job. (Def.'s 56.1 ¶ 122.)

of[sic] the night shift crew."  (*Id.* ¶ 7.)  Challenger's CFO Susan Lutz wrote in her declaration, however, that "[u]pon completion of each rig's job requirements, the Steward[sic] was verbally advised by the Challenger Supervisor to reduce the labor crew by two (2).  Therefore, the steward decided who stayed on and who was released."  (Lutz Decl. at ¶ 5, Ex. 23 to Pl.'s 56.1.)  Smolik testified that he has no knowledge of Plaintiff's 2013 lawsuit, and there is no evidence in the record contradicting this testimony.  (Def.'s 56.1 ¶ 125.)

### 4. 2016

Tarochione claims that she worked between four and five weeks in 2016.  (Def.'s 56.1 ¶ 128.)  Her W-2 records show, however, that she worked 356.5 hours, earning $22,049.  (Def.'s 56.1 ¶ 55.)  These were the fewest hours Tarochione had worked in a calendar year, and the least amount of money she had made in a single year since 2012.  She did not directly solicit any contractors for work on her own.  (*Id.* ¶ 126.)  Although Tarochione contends that she "should have been called for work much more frequently," she has not identified any 2016 referrals that she believes she should have received but did not.  (*Id.* ¶ 127.)  Once again, Tarochione identifies no record evidence comparing her work assignments to those of other Local 75 members.

In April or May 2016, Local 75 referred Tarochione to a job with Brock Construction ("Brock").  (Def.'s 56.1 ¶ 128.)  In September 2016, Local 75's then-vice president, Mike Serena, texted Tarochione and asked if she was "still off work."  (Tarochione Dep. at 188-89, Ex. 4 to Def.'s 56.1.)  According to Serena, he asked this because he intended to talk to Tarochione about a job referral.  (Serena Decl. ¶ 3, Ex. 21 at Def.'s 56.1.)  Tarochione responded "No.  How u doing?"  (Tarochione Dep. at 189.)  At that time, Tarochione was not working; she now contends she misunderstood Serena's question.  (Pl.'s Resp. Def.'s 56.1 ¶ 131.)

In November 2016, Serena contacted Tarochione about a referral to a job that involved flagging.  (Def.'s 56.1 ¶ 130.)  Tarochione declined the referral because her flagger certificate had expired several months prior, as a consequence of her failure to renew it.  (*Id.* ¶ 132.)

### III. The Complaint

On November 18, 2015, Tarochione filed a complaint against Local 75 with the Equal Employment Opportunity Commission (the "EEOC") alleging that Local 75 failed to refer her for work in retaliation for the 2013 Settlement and because of her sex. (Def.'s 56.1 ¶ 59.) The EEOC granted Tarochione a right to sue. She thereafter filed the Complaint in this case on June 28, 2016, and amended it on December 13, 2017. (*Id.* ¶ 59.)

As amended, the Complaint contains two counts based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[16] Count I alleges that Local 75 failed to refer Tarochione to certain jobs because she is a woman, and Count II charges that this conduct constituted retaliation for the 2013 Settlement. (*Amended Complaint* [81] at ¶¶ 22-36.) Although the Complaint does not state a separate claim that Local 75 subjected Tarochione to a hostile work environment, it contains some language to that effect. (*See, e.g. id.* ¶ 33.) On January 5, 2018, Local 75 moved to dismiss portions of the Complaint, including any implied hostile environment claim. (Motion to Dismiss [85].) Following a hearing in which Plaintiff's counsel acknowledged that Plaintiff did not intend to bring a hostile work environment claim, the court granted the motion to dismiss in part. (Feb. 22, 2018 Minute Order [95].) The motion was otherwise denied. (*Id.*)

### DISCUSSION

Tarochione alleges that Local 75 failed to refer her to jobs both because she is a woman and because of her conduct related to the 2013 lawsuit. She brings two claims under Title VII, alleging that Local 75's actions constituted (1) retaliation for protected conduct and (2)

---

[16] The Complaint states that it is also brought "pursuant to the United States Constitution" and asserts that Tarochione, as a citizen, "is entitled to all right, privileges and immunities guaranteed to all citizens of the United States under the Constitution and Laws of the United States." (*See Amended Complaint* ¶¶ 1, 5.) The Privileges and Immunities Clause, contained in Article IV, Section 2 of the United States Constitution, has never been held to regulate the conduct of private actors. *See generally McBurney v. Young*, 569 U.S. 221, 227 (2013). To the extent that the Complaint purports to a state a claim for a constitutional violation, that claim is dismissed.

discrimination on the basis of sex. Local 75 now moves for summary judgment. Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Montgomery v. American Airlines*, Inc., 626 F.3d 382, 389 (7th Cir. 2010). The movant bears the initial burden to show that the non-moving party's evidence is insufficient to establish a material element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party "must supply evidence sufficient to allow a jury to render a verdict in [her] favor." *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998) (quoting *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1996)).

## I.      Waiver of Certain Arguments

As a threshold issue, Local 75 argues that Tarochione is barred from asserting Title VII claims based on the 2013 BMW and Henkels & McCoy referrals due to a waiver she entered into as part of the 2013 Settlement. On September 10, 2013, Tarochione agreed to waive and release Local 75 from "all claims, rights, demands, costs, actions, causes of action, obligations, damages, and liabilities, whether known or unknown, of whatever kind or nature, that arose on or before [September 10, 2013], including but not limited to [claims under Title VII]." (Settlement Agreement at ¶ 3(a)(iii), Ex. 27 to Def.'s 56.1.) Tarochione further affirmed that she "understands that she is releasing Claims that she may not know about. That is her knowing and voluntary intent. Nevertheless, she is assuming that risk and agrees that this Agreement shall remain effective in all respects in any such case." (*Id.*) Tarochione was represented by an attorney in the negotiation and execution of this agreement. (Def.'s 56.1 ¶ 51.)

Local 75 referred members to the BMW and Henkels & McCoy jobs in May and August 2013, respectively. Tarochione has not identified any conduct relevant to these jobs that occurred subsequent to the agreement she executed in September 2013. In her response to the motion for summary judgment, Tarochione has not so much as acknowledged this term of the 2013 Settlement, let alone challenged Local 75's contention that it partially bars Tarochione's claims here. The court agrees with Local 75's reading of the waiver, and accordingly grants Local 75 summary judgment on Tarochione's claims to the extent she seeks recovery for actions relating to the BMW and Henkels & McCoy jobs. The court nevertheless considers these allegations as relevant background for Tarochione's live claims.

Local 75 further argues that any claim based on its failure to refer Tarochione to Turner in October 2013 is barred by Title VII's statute of limitations. In general, 42 U.S.C. § 2000e–5(e)(1) requires that a Title VII plaintiff file a charge with the EEOC no more than 180 days "after the alleged unlawful employment practice occurred." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002). Tarochione did not file an EEOC charge in this case until November 2015, two years after Local 75 referred members to the 2013 Turner job. Tarochione argues that the standard statute of limitations does not apply in this case, however, because Local 75's conduct amounted to a "continuing violation." *See Tinner v. United Ins. Co. Am.*, 308 F.3d 697, 707 (7th Cir. 2002).

The court needs not reach the statute of limitations issue, however, because Tarochione never actually argues that the 2013 Turner referrals are relevant to her claims. Her statement of facts only briefly mentions that she was referred to Turner in November 2013, without discussing Local 75's earlier referral of other members to Turner.[17] Tarochione's argument, moreover,

---

[17] Instead, Tarochione sets out a series of somewhat vague allegations regarding to her attempts to obtain work prior to November 2013, when she ultimately was referred to Turner. (*See* Pl.'s Resp. Def.'s MSJ at 8.) These include allegations that Tarochione had an argument with Dietz on October 28, that Dietz yelled at Tarochione during this argument, that Tarochione informed Dietz of a violation of the referral rules during this argument, that Tarochione called Dietz again on October 30, that Dietz then lied to Tarochione about his understanding of Tarochione's

expressly addresses only three other referrals: those to the "Nooter, Henkels, and Challenger jobs." (Pl.'s Resp. Def.'s MSJ [113] at 15-21.) Tarochione does not address Local 75's argument that she was ineligible for a referral in October 2013, and thus does not dispute that Local 75's failure to refer her to Turner in October 2013 was not an "adverse action" under Title VII. (*See* Def.'s MSJ [103] at 20.) This constitutes a waiver of any claim that Local 75's conduct in referring other members but not Tarochione, to Turner violated Title VII. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.") The court considers this incident, like the other 2013 referrals, as potentially instructive background information to the factual allegations on which Plaintiff's claims directly focus, but notes that "[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996), *amended* (Mar. 28, 1996) (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, 479 U.S. 1056 (1987)). If Tarochione felt the Turner referral was relevant to her claims, it was incumbent on her to explain why.

## II.    Retaliation Claim

Title VII makes it unlawful for a labor organization to retaliate against any member because the member opposed, complained of, or sought remedies for discrimination prohibited by Title VII. 42 U.S.C. § 2000e-3(a). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Tarochione contends that she engaged in protected conduct by "filing a grievance" with Local 75 and that, in retaliation, Local 75 declined to extend Tarochione referrals to which she was otherwise entitled. Local 75 disputes that

---

work-status, and that Tarochione threatened to obtain a lawyer. (*Id*.) These allegations are not discussed in Plaintiff's Statement of Additional Facts but do find limited support on several pages of Tarochione's deposition. (*See* Tarochione Dep. at 129-131, Ex. 1 to Pl.'s 56.1.) Plaintiff does not later reference any of these allegations in support of her legal arguments.

Tarochione can prove that she engaged in protected conduct, that she suffered an adverse employment action, or that any protected conduct was the but-for cause of an adverse action. The court addresses these challenges in turn.

## A.    Protected Activity

Protected activity under Title VII includes "participating in a Title VII proceeding or opposing a practice made unlawful by Title VII." *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009).  Although Tarochione's complaint alleges broadly that "her actions in connection with filing and then settling [the 2013 lawsuit]" constituted protected conduct, Tarochione's response to Local 75's motion for summary judgment identifies only one particular action: her "filing of a grievance" with Local 75.[18]  (Pl.'s Resp. Def.'s MSJ [113] at 13-14.)  Tarochione alleges that in this "oral grievance," purportedly lodged with Local 75 on or about August 21, 2012, she related, "that I was fired for a made-up, false reason and that I was replaced with a male worker. I complained that I was terminated because I was female."  (Dec. 1 Tarochione Decl. ¶¶ 2-5.)

Local 75 argues that this alleged grievance does not technically oppose a practice made unlawful by Title VII, and therefore is not protected.  They observe that in the 2013 Complaint, Tarochione alleged that "On or about August 21, 2012, [Tarochione] contacted union representatives in order to file a formal grievance with Local 75, complaining that she was unjustly terminated by Roberts Pipeline."  (2013 Complaint ¶ 22.)  Local 75 argues that Tarochione's use

_____

[18]      Tarochione writes more broadly in her statement of facts that "[t]he facts surrounding the [2013] discrimination case and its settlement was[sic] the protected action that led to retaliation."  (Pl.'s Resp. Def.'s MSJ at 7.)  In a parenthetical, she also identifies her protected action as "(her grievance and the related complaint)," and in a footnote she highlights deposition testimony in which she implies that the cause of her retaliation was "the September 2013 settlement."  (*Id.* at 13 n.8, 15.)  Tarochione does not support these contentions—that her filing and decision to settle the 2013 lawsuit were protected actions—with any case law, nor does she discuss them at any length.  Local 75, in its Motion for Summary Judgment, laid out a credible legal argument that Tarochione's involvement in the 2013 lawsuit itself was not protected activity for purposes of Title VII: it was a claim that Local 75 had breached its duty of fair representation, not of discrimination in violation of Title VII.  (Def.'s MSJ [103] at 14-15.)  Because Tarochione failed to address this argument, any argument to the contrary is deemed waived.

of the term "unjust" in this context constitutes a judicial admission that her grievance opposed only a "perceived contract violation," rather than one opposing gender discrimination.

The language of the 2013 Complaint defeats Local 75's argument on this score. The paragraph immediately prior to the one cited by Local 75 states, "Roberts Pipeline's reason for terminating Plaintiff is false and merely pretext for discrimination." (2013 Complaint ¶ 21.) And Count III of the 2013 Complaint brings a charge against Roberts Pipeline for sex discrimination. (*Id.* ¶¶ 44-53.) It is apparent that plaintiff's alleged filing of a grievance, presumed to be true for purposes of this motion, opposed a practice made unlawful by Title VII: namely, sex discrimination. The grievance therefore constituted protected activity under Title VII. *See Emerson v. Dart,* 900 F.3d 469, 472 (7th Cir. 2018) (holding that the filing of a grievance indicating that discrimination occurred "because of sex, race, national origin, or some other protected class" constituted statutorily protected activity under Title VII (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)), *reh'g denied* (Sept. 25, 2018).

### B. Adverse Action

An "adverse action" is one that "a reasonable employee would have found . . . materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Where the action is alleged to be in response to the "making or supporting [of] a charge of discrimination," it is material if it "might have dissuaded a reasonable worker from [engaging in that conduct]." *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). Notably, the adverse action must have been taken by the defendant itself. Where, as here, the defendant is a union, the universe of adverse actions on which the plaintiff can rely is limited. The Seventh Circuit has explained, "if a union 'discriminates in the performance of its agency function, it violates Title VII, but not otherwise. . . . [I]f it merely fails to effectuate changes in the workplace . . . the union is not guilty of discrimination". *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 652 (7th Cir. 2006) (quoting *EEOC v. Pipefitters Local 597*, 334 F.3d 656, 659 (7th Cir.2003)). Thus, the issue here is whether there is record evidence supporting the notion that materially

adverse actions were taken by Local 75 itself.  Although Tarochione alleges broadly that adverse actions abounded between her execution of the 2013 Settlement and the filing of this lawsuit, she identifies only two jobs that, she contends, evidence adverse actions by Local 75: the Nooter job and the Challenger job.  (*See* Pl.'s Resp. Def.'s MSJ [113] at 15-17.)

Tarochione has created a triable issue of fact as to whether Local 75's referrals to the Nooter job constituted materially adverse actions.  It is undisputed that on September 10, 2015, then-Local 75 President William Martin bypassed Tarochione on the OWL to offer referrals to two other members over whom Tarochione had priority.  Local 75 has not identified any neutral rule that compelled this decision; the workers were not requested by name, nor by skillset.  Nor has Local 75 alleged that these workers were better qualified for the Nooter job than was Tarochione.  Even accepting Martin's explanation—that he bypassed Tarochione due to Terry Speed's request for workers approaching retirement—the decision not to refer Tarochione remained Martin's, and therefore Local 75's, because Martin had discretion in fulfilling this request.  Martin presumably could have fulfilled the request by hiring only one worker approaching retirement, which may have opened up a slot for Tarochione.  Martin moreover had discretion to determine who qualifies as a retiring worker and evidently decided that Tarochione was not retiring soon enough.  He also could have disregarded the request altogether, and chose not to.  A reasonable jury could find that these decisions constituted adverse actions taken by Local 75.

The Challenger job raises different concerns.  Unlike the Nooter referrals, the Challenger referrals comported with Local 75's referral rules.  It is undisputed that Challenger requested workers with directional drilling experience, and Local 75's referral rules thus compelled the use of an OWL that filtered out Tarochione's name.  Although Tarochione testified to facts calling the authenticity of Challenger's need for workers with such experience into question—namely, Tarochione recalls seeing a worker referred prior to her performing tasks unrelated to directional drilling—these allegations only support the notion that Challenger took an adverse action against Tarochione, not that Local 75 did.

Layoff from the Challenger job is adverse action. *See Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008). With respect to the question whether this action is attributable to Local 75, Challenger's CFO testified that Local 75's appointed steward was advised only to lay off two people, and therefore that Local 75 had discretion whether to fire Tarochione or another laborer. Notwithstanding Local 75's evidence to the contrary, a jury could find that Local 75 made the decision to lay Tarochione off, and therefore this is another adverse action supported by the record.

In sum: Tarochione has created triable issues of fact as to whether Local 75 engaged in two actions materially adverse to Tarochione: declining to refer Tarochione to the Nooter job, and selecting her for removal from the Challenger job.

## C.    Causation

The dispositive question regarding causation is "whether a reasonable jury could find a but-for causal link between the protected activities and adverse actions at issue." *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 697 (7th Cir. 2017). Where a plaintiff lacks direct evidence of causation, she may "rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." (*Id.*) Actions that do not qualify as adverse, moreover, "may still be evidence of retaliatory motive for actionable actions." (*Id.*).

Tarochione identifies scant evidence tying her filing of an oral grievance with Martin's decision to refer other members to the Nooter job. Her discussion on this subject does not include even a single citation to record evidence. (Pl.'s Resp. Def.'s MSJ [113] 17-19.) Instead, Tarochione's argument is largely comprised of vague and conclusory allegations that do not, together, state a provable claim of retaliation. Tarochione's alleged protected action was taken in August 2012, more than three years before she alleges retaliatory treatment in the Nooter referrals. Tarochione claims that these events were connected by a "continuous" string of "[n]egative actions against Plaintiff," but fails to actually identify adverse actions connecting the

22

two events.  (Pl.'s Resp. Def.'s MSJ [113] 18.)  Her principal evidence is her recollection that she verbally accused Dietz of retaliating in October 2013.  That episode, however, does virtually nothing to prove causation concerning referrals in 2015; Tarochione has not alleged that Dietz said anything evidencing retaliation in response (indeed, it is undisputed that Dietz has never commented on the 2013 lawsuit) and it was Martin, not Dietz, who made referrals to Nooter.

Tarochione further alleges that the only jobs she was able to obtain between 2013 and 2015 were with unspecified help from acquaintances, including an acquaintance named George Obis, and that the Nooter job was "[t]he first time that Plaintiff was without work without Mr. Obis to help her out." (Pl.'s Resp. Def.'s MSJ [113] at 17-18.)  The court has difficulty giving credit to this allegation, however, because Tarochione fails to identify clear support for it.  The record is replete with jobs to which Tarochione was referred by Local 75 between 2013 and 2015, and Obis himself testified that he never spoke to any Local 75 representative about Tarochione during this period.  (Def.'s 56.1 ¶ 142.)

William Martin testified that his reason for referring two members lower than Tarochione on the OWL list was to accommodate a request by Terry Speed for workers nearing retirement. Tarochione's claim depends on showing Martin's explanation to be pretextual.  *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 697 (7th Cir. 2017).  ("[B]ecause the Board has presented non-retaliatory reasons for [the defendant's] conduct, the true question is whether the proffered reasons were pretext for retaliation.")  Tarochione suggests that Martin's explanation is "some lawyer assisted made up story that coincidentally fit some facts."  Tarochione's criticism of this explanation falls completely flat.  She alleges that "Martin told inconsistent versions between his first and second depositions," but cites nothing in the record in support of this claim. She claims that Martin is lying about his conversation with Speed, and that "Speed testified that he did not speak to Martin," but this is an obvious misreading of the record; Speed testified that although he does not *recall* speaking to Martin, requesting workers nearing retirement is a common practice of his.  (Def.'s 56.1 ¶ 108.)   Most significantly, in referring two workers near

retirement age, Martin passed over more than 100 other men and 26 other women. The notion that this decision was retaliatory (or motivated by sex) simply does not "fit some facts" at all.

With regard to Tarochione's termination from the Challenger job, the record is similarly deficient on causation. On this issue, Tarochione fails to even raise a serious legal argument. She writes only, "For reasons that are similar, the other examples of discrimination, that is, referrals to the part time PT Ferro work, the Henkels job, and the Challenger position also require a jury to sort out the factual issues. Thus, Defendant's motion should be denied." (Pl.'s Resp. Def.'s MSJ at 19.)[19] It is undisputed that the Neal Smolik (Local 75's appointed steward, who Tarochione contends was responsible for the decision to lay her off from the Challenger job) had no knowledge of the 2013 lawsuit, much less Tarochione's filing a grievance with Martin in 2013. This evidence meets Local 75's initial burden to show that there is no material dispute of fact. The court would therefore empanel a jury to "sort out" what happened only if Tarochione had met her burden to "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Tarochione has identified no evidence that tends to show that her involvement in protected activity was the but-for cause of any adverse actions taken by Local 75. The court accordingly grants Local 75's motion for summary judgment on Count II.

### III. Sex Discrimination Claim

Title VII prohibits discrimination by labor organizations against any individual because of her sex. 42 U.S.C. § 2000e-2(c)(1). To survive summary judgment on a Title VII sex-discrimination claim, a plaintiff must present evidence from which a reasonable factfinder could conclude that the plaintiff's sex was the cause of an adverse employment action. *David v. Board*

---

[19] As discussed above, any claims based on the Henkels & McCoy job were waived under the 2013 Settlement. *See* Discussion, *supra*, at Section I. Tarochione never specifies how referrals to P.T. Ferro could have constituted adverse actions, even if, as she contends, the jobs were undesirable. Local 75 members are free to decline any referral while maintaining their position on the OWL. *See* Statement of Facts, *supra*, at Section I.

*of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Plaintiffs commonly rely upon the *McDonnell-Douglas* framework to make this showing; adapted to the union referral context, the plaintiff could create an inference of discrimination with evidence (1) that she is a female; (2) that she was qualified for work referral; (3) that, despite her qualifications, the union failed to refer her; and (4) that following the failure, the union continued to refer other members with her qualifications for job assignments, or otherwise took adverse action. *See generally Stair v. Lehigh Valley Carpenters Local Union No. 600 of United Brotherhood of Carpenters and Joiners of Am.,* No. CIV. A. 91-1507, 1993 WL 235491, at *16, *18 (E.D. Pa. July 24, 1993), *aff'd*, 43 F.3d 1463 (3d Cir. 1994) (noting that hours worked by a union member may depend on whether the member "solicits employment, whether he or she uses the referral system, whether an employer asks for that [union member] by name, . . . and whether the [union member] has the skills requested by an employer when that employer calls the Union for a referral"). Whether or not a plaintiff proceeds under such a framework, the court must always consider the ultimate question of whether she has "has produced sufficient evidence to support a jury verdict of intentional discrimination." *David*, 846 F.3d at 224.

It is undisputed that Tarochione is a member of a protected class and was generally qualified for job referrals from Local 75. As discussed in Section II, *supra*, Tarochione has identified two adverse actions taken by Local 75: its failure to refer Tarochione to the Nooter job, and Tarochione's dismissal from the Challenger job. The question for this court is whether there is evidence that similarly-situated male members of Local 75 were treated more favorably than was Tarochione in analogous circumstances. Tarochione purports to have shown "several instances . . . in which males were given preferential treatment (for example, the John Carroll comparisons, William Thiakos and Challenger, and the Nooter referral)." (Pl.'s Resp. Def.'s MSJ at 20.) This claim is unsupported by any citation to the record, or even an explanation. Tarochione does not allege that these individuals were similarly situated, nor does she clarify what preferential treatment she believes them to have received. The court has nevertheless

endeavored to determine whether there is record evidence concerning any of these individuals-- Carroll, Thiakos, or unspecified individuals involved in the Nooter job—that might support Tarochione's claim of sex discrimination.

First, John Carroll: the court can find no evidence of John Carroll's relevance to the alleged adverse treatment. At her deposition, Tarochione discussed Carroll's involvement in the BMW and Henkels & McCoy jobs (see Def.'s 56.1 ¶¶ 67, 74), but Tarochione has waived all claims relative to these jobs. (See Discussion, supra, at Section I.) There is no evidence or argument linking Local 75's treatment of Carroll in 2013 to its refusal to refer Tarochione to the Nooter job in 2015 or its alleged decision to remove Tarochione from the Challenger job the following year. Tarochione has not demonstrated that Carroll has any relevance to her discrimination claim.

The court is aware of two individuals who were given arguably preferential treatment in the Nooter referrals: Dennis Day and John Radakovich. Notably, Tarochione has not identified either of these individuals by name, nor does she substantiate the implication that they were similarly-situated to her. And through the testimony of William Martin and Terry Speed, Local 75 has presented a non-discriminatory explanation referring Day and Radakovich over Tarochione (and more than 100 men); Speed's preference for workers who are near retirement. Tarochione has identified no record evidence calling this explanation into question, much less indicating that her gender was the real culprit.

With respect to William Thiakos, the court finds no record evidence that he received more favorable treatment than Tarochione with respect to the Challenger job. As discussed in Section II.B., supra, the only actionable adverse action Local 75 may have taken with regard to the Challenger job involves Tarochione's termination, not a failure to hire. Tarochione has not alleged that Thiakos remained on the Challenger job after her layoff, nor that he was kept on any other job for a longer period of time under similar circumstances. Indeed, the parenthetical in which Tarochione perfunctorily identifies Thiakos as an example of a man afforded preferential

treatment is the *only instance* in which Tarochione ever mentions Thiakos in her memorandum in opposition to summary judgment.

Tarochione has not presented a prima facie case of discrimination under the recognized framework, but is not required to do so, if she can instead identify other circumstantial evidence from which a jury could conclude that she was discriminated against because of her sex. Such evidence can involve "suspicious timing or ambiguous statements, evidence that others outside the protected class were systematically treated better, or evidence that the employer gave a pretextual reason for the adverse employment action." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 877 (7th Cir. 2014). As with her retaliation claim, however, Tarochione has cited no record evidence in support of her sex discrimination argument. She states, with regard to the Nooter referral, that "there were ambiguous statements in that Martin's initial statements were that he did not know how he referred the laborers to Nooter. This was followed by inconsistent testimony from other persons on the same subject." (Pl.'s Resp. Def.'s MSJ at 20.) Tarochione has not bothered to identify the purported inconsistencies. She does again assert that Speed never spoke to Martin about the Nooter referrals, but that, as noted earlier, is a misreading of Speed's testimony. Tarochione also claims to have been repeatedly denied referrals to jobs for which she was "recommended," which she says differs from the treatment her male counterparts received. (*Id.*) Without any citation to the record, the court is unable to understand or evaluate this claim.

Local 75 has met its burden to show that the absence of disputed facts concerning Tarochione's claims of discrimination. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Local 75 identified six referrals it offered to Tarochione in 2015 and has identified non-discriminatory circumstances—Tarochione's inability to work at nuclear power plants, her lack of a certification for directional drilling, and her failure to independently seek employment—as the reason for Tarochione's not working even more than she did. The burden thus shifted to Tarochione to "come forward with specific facts showing there is a genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). She has not done

so. The court therefore grants summary judgment to Local 75 on the discrimination claim.

## **CONCLUSION**

Defendant's motion for summary judgment [101] is granted.

ENTER:

Date: March 26, 2019

_____
REBECCA R. PALLMEYER
United States District Judge